UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
————————————————————————x

CONSOLIDATED EDISON COMPANY
OF NEW YORK, INC.,

        Plaintiff,

    -against-

LEXINGTON INSURANCE COMPANY,

        Defendant.
————————————————————————x

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __9|9|15__
```

No. 14 Civ. 6547 (CM)(JLC)

## MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT
### (Revised Decision)

McMahon, J.:

### BACKGROUND

In this insurance coverage dispute, the following facts are undisputed:

Consolidated Edison of New York (Con Ed) entered into a contract with Team, Inc. (Team) on January 1, 2003. Team agreed to provide repairs to Con Ed's steam system, which runs under the streets of New York City, at various locations, during the period beginning February 21, 2007 and ending February 21, 2009. (Kevane Decl. Exh. 12 at CONED0000855, Exh. 15, at LEX0000075).

The contract required Team to indemnify Con Ed for all claims resulting from personal injury or property damage connected to Team's work. Team was to obtain a comprehensive general liability insurance policy under which Con Ed would be an additional insured. This policy "shall be primary coverage as to the additional insureds." (Kevane Decl. Exh. 12 at CONED0000876.)

1

Team purchased such a policy from Lexington for the period May 31, 2007-May 31, 2008. The policy (No. 0476882) has a $2 million limit per occurrence and a $10 million general liability limit.[1] (Kevane Decl. Exh. 13 at LEX0003630). The term "occurrence" is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." In the event of continuing exposure, there is only one "occurrence," and it happens when the exposure commences. (*Id.* at LEX0003654).

Pursuant to Endorsement #020 (Additional Insured – Owners, Lessees or Contractors—Schedule Person or Organization), Con Ed was named as an additional insured on the Policy. The Endorsement provides that:

> This insurance is primary and non-contributing as respects to the person or organization. Any other insurance available to such person or organization shall be excess and non-contributing with this insurance.

(*Id.* at LEX0003701.)

On July 18, 2007, a steam distribution main at the intersection of Lexington Avenue and East 41st Street, on which Team had finished working, ruptured, creating a huge crater in the intersection and sending steam and debris, including asbestos insulation, into the surrounding area. The rupture caused substantial damage to nearby buildings, vehicles and underground infrastructure. It also caused personal injury, notably to two individuals in a tow truck that fell into a crater, as well as a woman who suffered a fatal heart attack while running from the explosion. (Kevane Decl. Exh. 15 at LEX000076).

A total of 45 lawsuits were filed against Con Ed arising out of this "occurrence." (*Id.* at LEX000080).

---

[1] The contract required Team to obtain insurance in the amount of $5 million per occurrence for bodily injury and $1 million per occurrence for property damages, or a combined limit of $5 million per occurrence. The Lexington Policy has a $2 million per occurrence cap. The parties do not explain this discrepancy. I assume that the non-conforming policy was acceptable to Con Ed.

On September 7, 2007, Con Ed notified Team that components of the steam pipe on which Team had worked might be implicated in the explosion. (Kevane Decl. Exh. 15 at LEX000078-79).

One week later, on September 14, 2007, Con Ed provided Lexington with written notice of the explosion and tendered defense to the insurer. (SF 20). In its notification letter, Con Ed indicated that it believed work performed by Team (Lexington's insured) "may be involved in the cause of the rupture" and demanded that Lexington "protect Con Edison's interests." (Kevane Decl. Exh. 1 at LEX0003574).

Lexington acknowledged receipt of the notice and tender of defense on September 27, 2007. However, it indicated that, "The terms and conditions of the Lexington policy require Team....to be responsible for investigation and/or defense of this claim until the retained limit [of $250,000] is reached." (Kevane Decl. Exh.14 at CONED0000381).

On March 31, 2008, Con Ed sent a letter to Lexington, indicating that the steam traps were "substantially clogged" with resin that Team had been using to repair leaks, and again demanding that Lexington "protect Con Edison's rights." (Kevane Decl. Exh. 15 at LEX0000078). Simultaneously, Con Ed sent a letter to Team, demanding indemnification in connection with the explosion. (*Id.*)

On April 30, 2008, Team advised Con Ed that it would not provide a defense or indemnification, because Con Ed's negligence, not Team's, caused the explosion. (*Id.* at LEX0000079).

On October 6, 2008, Lexington, having conducted its initial investigation, issued a reservation of rights letter. In that letter, Lexington reserved its rights "as to whether the alleged liability of ConEdison is based only on the work or operations of Team," and pointed to several

3

potential policy exclusions (including pollutants like asbestos), the damage from which was expressly excluded from coverage. Nonetheless, Lexington indicated that there was the "potential for coverage" with respect to the three lawsuits of which it was already aware, as well as 42 additional actions, and specifically said, "Lexington is prepared to defend ConEd with respect to these matters." (*Id.* at LEX0000093). Lexington asked ConEd to provide it with copies of all lawsuits that had been filed again Con Ed, so that it could evaluated coverage with respect to those matters. (Id. at LEX0000095).

Notwithstanding Lexington's acceptance of Con Ed's original tender of defense, plaintiff did not permit Lexington to defend the lawsuits. In fact, it did not tell Lexington much of anything about the lawsuits. It retained its own outside counsel and apparently had in-house counsel (a captive law firm) perform some of the relevant legal work. (Kevane Decl. Exh. 5, page 3). Nor did Con Ed comply with Lexington's request for copies of the complaints and defense cost invoices – not the request made in the October 6, 2008 reservation of rights letter, and not subsequent requests, which were made in July 2009 and March 2010. (Kevane Decl. Exh. 15 at LEX0000095, Exh. 16 at CONED0000999, Exh. 17 at CONED0000410.)  In fact, Con Ed did not provide Lexington with that information until July 21, 2011! (Kevane Decl. Exh. 20 at CONED0000373).

During those years, Con Ed's over $50 million in legal fees did not go unreimbursed. Con Ed had a number of other layers of insurance, and it had notified those insurers about the accident on July 19, 2007 – the day after it occurred, and almost two months before plaintiff notified Lexington. (Kevane Decl. Exh. 26).

The first excess layer consisted of a $35 million liability policy issued by Associated Electric and Gas Insurance Services Limited (AEGIS); coverage was triggered when Con Ed satisfied a self-insured retention of $5 million. The AEGIS policy was "cost-erosive;" unlike the

4

Lexington Policy, every dime paid out in defense costs under those policies went toward the policy limits and was therefore unavailable to satisfy liabilities. (Kevane Decl. Exh. 8)

Con Ed notified AEGIS that it had exceeded the $5 million retention threshold on October 31, 2007; by that time it had already paid $8,105,682.93 in costs arising out of the explosion. Con Ed demanded that AEGIS reimburse it for the balance over $5 million; AEGIS paid Con Ed $3,105,682.93 on December 12, 2007. (Kevane Decl. Exh. 10).

Con Ed thereafter submitted the following bills to AEGIS, all of which were paid by AEGIS:

| Date of AEGIS Payment to Con Ed | Amount of Payment |
| --- | --- |
| December 12, 2007 | $3,105,682.93 |
| March 24, 2008 | $5,345,487.96 |
| September 22, 2008 | $6,000,000.00 |
| December 9, 2008 | $6,300,489.76 |
| March 12, 2009 | $2,464,697.46 |
| June 30, 2009 | $2,907,291.46 |
| November 19, 2009 | $ 873,375.24 |
| December 7, 2009 | $1,321,238.69 |
| June 10, 2010 | $1,047,600.37 |
| August 9, 2010 | $5,634,136.13 |
| | $35,000,000.00 |

By August 2010 Con Ed had run through the entire $35 million AEGIS layer of insurance. Its next layer was a $100 million liability policy issued by Energy Insurance Mutual (EIM). On August 10, 2010 Con Ed advised EIM that the limits of the AEGIS policy had been exhausted and demanded that EIM begin reimbursing it for defense costs. (SF 13) EIM made the following payments to Con Ed:

| Date of EIM Payment to Con Ed | Amount of Payment |
| --- | --- |
| October 14, 2010 | $ 78,207.78 |
| January 28, 2011 | $1,731,897.04 |
| April 15, 2011 | $ 680,992.65 |
| August 15, 2011 | $1,120,786.97 |
| January 27, 2012 | $3,507,264.75 |

| May 11, 2012 | $1,972,975.73 |
| September 29, 2012 | $1,564,899.90 |
| December 21, 2012 | $ 312,624.70 |
| March 29, 2013 | $ 743,662.91 |
| October 24, 2013 | $ 933.391.70 |
| December 20, 2013 | $1,199,135.98 |
| April 17, 2014 | $1,335,728.07 |
| June 19, 2014 | $1,238,944.51 |
| September 11, 2014 | $1,368,344.71 |
| | $17,788,857.40 |

Some portion of these payments was for settlements, but there is no dispute that the rest was reimbursement for defense costs.

Neither AEGIS nor EIM reimbursed Con Ed for the $5 million self-insured retention or for the cost of its so-called "in house counsel" (the Law Offices of Richard W. Babinecz, a captive law firm). I will hereafter refer to these sums as Con Ed's "unreimbursed out of pocket costs."

On May 4, 2011, Lexington paid its policy limit ($2 million for the single "occurrence") to Con Ed. Con Ed accepted payment, and released Lexington from liability for defense costs incurred from and after the date of the release. (Kevane Decl. Ex 18). However, the Release tendered by Con Ed "does not include, and shall have no effect on, RELEASOR's claim for reimbursement under the Policy of reasonable defense costs incurred in connection with the claims and litigation arising out of the" Lexington Avenue steam pipe rupture, as long as those costs were incurred before the date of the release. (*Id.* at CONED0000779)

At the time Con Ed accepted Lexington's tender of the policy limits, one of its employees stated in an internal memorandum, "All other expenses incurred in the litigation to date ($59,856,961.34) have been reimbursed by AEGIS and EIM." (SF 28) Nonetheless, on July 21, 2011, Con Ed provided Lexington with its defense invoices for 2007, in the amount of $4,766,526.55 (SF 29). On December 2, 2011, Con Ed demanded that Lexington pay the 2007

6

invoices. (SF 30). This was Con Ed's first effort to obtain payment of defense costs from Lexington – even though Lexington had asked for information about defense costs as early as October 2008.

On May 17, 2012, Con Ed sent additional defense cost invoices for 2008 ($9,567,455.14); 2009 ($4,073,035.68); 2010 ($4,100, 124.48) and 2011 ($2,565,776.91).

Lexington has not paid Con Ed anything on these invoices.

In addition to the AEGIS and EIM insurance policies Con Ed has the following other excess liability insurance that can be looked to for reimbursement of settlement and defense costs: AIG Global Energy (8763639) with limits of $50,000,000 per occurrence and an aggregate limit of $50,000,000 (Kevane Decl. Exh. 25 at CONED0001501); XL Insurance (Bermuda) LTD (BM00022765LI07A) with limits of $100,000,000 per occurrence and an aggregate limit of $100,000,000 (*Id.* at CONED0001259); Arch Reinsurance LTD (UFC0015039) with limits of $50,000,000 per occurrence and an aggregate limit of $50,000,000 (*Id.* at CONED0001199); Allied World Assurance Company (C003339/004) with limits of $50,000,000 per occurrence and an aggregate limit of $50,000,000 (*Id.* at CONED0001227); Oil Casualty Insurance, LTD (U920050-0407) with an aggregate limit of $65,000,000 (*Id.* at CONED0001344); AEGIS London (B0509MN070070) with limits of $50,000,000 per occurrence and an aggregate limit of $50,000,000 (*Id.* at CONED0001288); Zurich Insurance Company (ZGEB-0106) with limits of $75,000,000 per occurrence and an aggregate limit of $75,000,000 (*Id.* at CONED0001392); Starr Excess Liability Insurance International LTD (5231999) with limits of $150,000,000 per occurrence and an aggregate limit of $150,000,000 (*Id.* at CONED0001319). All of these policies follow the AEGIS policy, and like the AEGIS and EIM policies (but unlike the Lexington policy), all of them are inclusive of defense costs, such that payment of defense costs reduces policy limits.

The total face value of this additional insurance is $615 million, in addition to the $135 million in insurance available through AEGIS and EIM. (*Id.* at CONED0001437).

## A.    The Instant Motion

On these undisputed facts, Lexington moves for partial summary judgment.

It seeks summary judgment dismissing Con Ed's claim for any defense costs that were reimbursed to it by AEGIS and EIM.

As to the rest of Con Ed's defense costs (i.e., Con Ed's unreimbursed out-of-pocket costs), it seeks summary judgment dismissing claims for any amounts incurred (1) prior to service of the notice of claim and tender of defense to Lexington (September 14, 2007) and (2) after it paid its policy limit to Con Ed (May 4 or 5, 2011).[2]

Con Ed opposed the motion but has not cross-moved for summary judgment.

## DISCUSSION

## I.    Standard for Summary Judgment

A party is entitled to summary judgment when there is no "genuine issue of material fact" and the undisputed facts warrant judgment for the moving party as a matter of law. Fed. R. Civ. P. 56; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).   On a motion for summary judgment, the court must view the record in the light most favorable to the nonmoving party and draw all reasonable inferences in his or her favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Whether any disputed issue of fact exists is for the Court to determine. *Balderman v. U.S. Veterans Admin.*, 870 F.2d 57, 60 (2d Cir. 1989).   The moving party has the initial burden of

_____

[2] The release was signed on May 4, but apparently the payment was made on May 5.

demonstrating the absence of a disputed issue of material fact. *Celotex v. Catrett*, 477 U.S. 317, 323 (1986).

Once the motion for summary judgment is properly made, the burden shifts to the non-moving party, who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250. The non-movant "may not rely on conclusory allegations or unsubstantiated speculation," *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998), but must support the existence of an alleged dispute with specific citation to the record materials. Fed. R. Civ. P. 56(c).

While the Court must view the record "in the light most favorable to the nonmoving party," *Leberman v. John Blair & Co.*, 880 F.2d 1555, 1559 (2d Cir. 1989) (citations omitted), and "resolve all ambiguities and draw all reasonable inferences in favor of the party against whom summary judgment is sought," *Heyman v. Commerce and Indus. Ins. Co.*, 524 F.2d 1317, 1320 (2d Cir. 1975) (citations omitted), the non-moving party nevertheless "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec.*, 475 U.S. at 586 (citations omitted). Not every disputed factual issue is material in light of the substantive law that governs the case. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In this case, there are no disputed issues of material fact. The only issue is whether Lexington is entitled to judgment as a matter of law.

## II.    Lexington is Entitled to Summary Judgment Dismissing Con Ed's Claim for Reimbursement of Defense Costs Already Reimbursed

An insured cannot obtain reimbursement for defense costs from one insurer when those costs have already been reimbursed by another insurer. The New York Court of Appeals, our state's highest court, made that clear in *Inchaustegui v. 666 Fifth Avenue Limited Partnership*, 96 N.Y. 2d 111 (2001). In that case, a commercial landlord was sued by the employee of a tenant for personal injury. The landlord's insurance policy covered the costs incurred in defending the suit. Nonetheless, the landlord sought reimbursement for those costs from the tenant, on the theory that the tenant had breached its contract to name the landlord as an additional insured under the tenant's liability insurance policy.

The Court of Appeals was having none of it. "The landlord obtained its own insurance and therefore sustained no loss beyond its out-of-pocket costs [such as deductibles, co-payments and increased future premiums.] Accordingly, it may not now look to the tenant for the full amount of the . . . defense costs in the underlying tort claim." *Id.* at 114. Or, put more simply – no double recovery.

The same result was reached by my colleague Judge Rakoff in *Garofalo v. Empire Blue Cross & Blue Shield*, 67 F. Supp. 2d 343 (S.D.N.Y. 1999). In *Garofalo*, the plaintiff-insured sued her employer's health insurer for reimbursement of medical bills that had already been paid by her husband's health insurance plan. The court dismissed the claim because the plaintiff had suffered no "actual out-of-pocket loss."

*Garofalo* was cited by the Eastern District of Kentucky in a case that is factually indistinguishable from this one: *Asher v. Unarco Material Handling, Inc.*, 862 F. Supp. 2d 551 (E.D.Ky. 2012). In *Asher*, numerous personal injury claims were filed against Unarco and a subcontractor arising out of equipment repairs at Wal-Mart. Unarco's insurer, Travelers, paid all

10

of the company's defense costs. In that case, as in this one, Lexington had insured the subcontractor. In that case, as in this one, Unarco was an additional insured under the Lexington policy. In that case, as in this one, Lexington owed Unarco a defense for the claims as an additional insured. In that case, as in this one, Unarco chose to be represented by its own insurer and then sued Lexington, seeking reimbursement of the same defense costs that Travelers had already paid. Judge Thapar granted Lexington's motion for summary judgment, holding that Unarco had suffered no damages because it "has neither incurred nor expended a single cent." *Asher,* 862 F.Supp.2d 551, 553 (E.D. Ky. 2012).

In all of these cases, the courts barred double recovery because it would have placed the plaintiff in a "better position" than he would have occupied had the contract been performed. This court sees no reason to do otherwise here. To the extent that its defense costs have been reimbursed by other insurers, Con Ed has not been damaged. Therefore, it has no claim for reimbursement of these expenses by Lexington.

Con Ed claims that it has been injured by virtue of "premature exhaustion" of the AEGIS policy (which is gone) and the EIM policy (which is depleted by some $17 million, but far from exhausted). The one and only case it cites for this proposition is not from New York, but California: *Flintkote Co. v. Gen. Acc. Assur. Co. of Canada*, 2008 WL 3270922 (N.D. Cal. Aug. 6, 2008). Putting aside the lack of precedential value of a case from another district that was undoubtedly applying another state's law,[3] the facts of *Flintkote* are not remotely similar to the facts of this case in the most critically important of ways.

---

[3] There is no explicit discussion of what law state's governed the policy at issue in the case, but the district court cited only California cases in its discussion of the "premature exhaustion" issue, so I assume that it was California law.

11

In *Flintkote*, the insured faced more than 270,000 asbestos claims. Flintkote's costs, in the amount of $630 million, were paid by various liability insurers, whose policies were subject to aggregate limits. At the time of *Flintkote* action, all those policies had been reached their limits, and the only policy Flintkote had left was one issued by Aviva. Aviva's policy had a per-occurrence limit of $100,000, but it was not subject to any aggregate limit. It was also the primary policy. Nonetheless, Aviva had steadfastly refused to contribute a dime to the cost of Flintkote's defense, thereby forcing Flintkote to invade lower layers of insurance. Having exhausted those layers, Flintkote was faced with the prospect of having to pay its future defense costs out of its own pocket.

Flintkote sued Aviva for a variety of damages on a variety of theories (including claims for contribution and/or subrogation on behalf of other primary and excess insurers), but in pertinent part it argued that, even though all its past legal bills and settlements had been reimbursed, it was damaged by virtue of the exhaustion of its other insurance. Judge Patel of the Northern District of California agreed that Flintkote had been directly harmed by Aviva's failure to pay on past claims, reimbursement notwithstanding. While describing Flintkoet's theory as "novel," *Flintkote Co.,* WL2477420 at *5, she stated the following rule:

> Where an insurer with unlimited aggregate liability breaches, and the gap is filled by an insurer whose performance reduces a liability policy with an aggregate limit, the insured suffers damage directly when the policy with an aggregate limit is unavailable to respond to later claims….[The insured] is directly harmed insofar as it can no longer rely on the policy with an aggregate limit to cover future claims and *is forced to pay the claim on its own*. (Emphasis added).

Judge Patel specifically identified the injury suffered by the insured as the expenses Flintkote would inevitably be forced to pay *out of its own pocket* in connection with future claims, because it had no other insurance to which it could look.

12

In *Asten Johnson, Inc. v. Columbia Cas. Co.*, 562 F. 3d 213 (3d Cir. 2009) – another asbestos case – the Third Circuit expressed some skepticism about the theory of recovery announced in *Flintkote*, but did not rule out the possibility of recovery under a "premature exhaustion" theory. However, the Third Circuit limited the theory's application to cases where alternative insurance really was "exhausted." Specifically, in *Asten*, the Third Circuit affirmed a district court's ruling that the plaintiff insured could prove no damages, because it failed to tender any evidence that it "had *yet* suffered a loss" in the form of out-of-pocket costs actually incurred as a result of that insurer's refusal to defend. *Asten*, 562 F.3d at 219 (emphasis added). The prospect that its alternative insurance would be depleted at an earlier date was not sufficient to establish damage – or, as the panel put it, "Far more than a 'burn rate' needs to be shown to successfully support the 'premature exhaustion' theory." *Id.* at 222.

New York has never adopted a "premature exhaustion" exception to the rule of *Inchaustegui*, and it is not clear to this court that it would do so. However, assuming arguendo that New York were to adopt the rule announced in *Flintkote,* as refined in *Asten*, the theory would not work in this case for at least two reasons:

In *Flintkote*, Aviva refused to pay anything toward claims or defense costs, leaving its insured no choice but to look elsewhere for a defense. In this case, by contrast, Lexington accepted the tender of defense, but Con Ed chose to look elsewhere, both for control of the defense and for payment of defense costs in the first instance.

In *Flintkote*, the insured had literally no insurance left with which to respond to future claims; in other words, it was inevitable that Flintkote would have to pay out-of-pocket costs on future claims. In this case, while Con Ed has already run though one layer of coverage (the AEGIS policy), it still has in excess of $80 million left on the second layer (the EIM policy), and hundreds

13

of millions of dollars in additional layers of insurance coverage – a total of $750 million in insurance. Con Ed is thus many hundreds of millions of dollars away from the day on which it will run out of coverage. There is no conceivable way that Con Ed has yet suffered, or is in any danger of soon suffering, the type of damages it here seeks, which I will call "premature reimbursement" of potential out-of-pocket costs that are anything but inevitable.

Con Ed well knows that not only has it not suffered, but it will not suffer, any compensable damage as a result of the fact that it looked first to its excess insurers and not to Lexington. Plaintiff admitted during discovery that it has more than enough insurance to meet its obligations arising out of the July 18, 2007 Lexington Avenue steam pipe explosion (Exh. 5, Response to Interrogatory No. 3, Response to Interrogatory No. 5.) As noted in Lexington's Reply Brief, Con Ed tries to create a genuine issue of fact on this score by arguing in its brief that "at present, it does not know" whether its remaining insurance will be enough to cover all its litigation costs. (Con Ed's Response to Lexington's Rule 56.1 statement, Docket #42, Item 7, p.3). However, it is bound by its previous admission and cannot contradict it here, under the rule that a party cannot contradict answers given during discovery to defeat a motion for summary judgment. *Perma Research & Dev. Co. v. Singer*, 410 F. 2d 572, 578 (2d Cir. 1969); *Hayes v. New York City Department of Corrections*, 84 F. 3d 614, 619 (2d Cir. 1996); *Margo v. Weiss*, 213 F. 3d 55, 61 (2d Cir. 2000).

Con Ed is concerned only with the fact that it might use up its other insurance sooner. But that is precisely the type of conjectural claim that the Third Circuit rejected in *Asten*—and for good reason, since courts do not award speculative damages in breach of contact suits. *Asten,* 562 F.3d at 224.

Con Ed's invocation of the admittedly novel "premature exhaustion" theory is particularly outrageous here – and not simply because its insurance is far from "exhausted." The undisputed

14

facts show that Lexington, unlike Aviva in *Flintkote*, accepted Con Ed's tender of defense and was prepared to defend (albeit under a reservation of rights). It repeatedly asked for information that would allow it to do so, only to receive no response whatsoever – not even copies of the complaints – from Con Ed. Contrary to Con Ed's assertion that it was "forced" to rely on its excess carriers (Opp. at 1-2) – a proposition for which Plaintiff cites not a scintilla of evidence – the only reason Lexington did not defend in the steam explosion lawsuits is that Con Ed chose not to avail itself of Lexington's services. Con Ed notified its other carriers well before it notified Lexington, hired its own lawyers, and submitted bills directly to the excess carriers without first submitting them to Lexington. There is no evidence that Con Ed tendered a single bill for defense costs Lexington before it looked to its excess carriers for payment. There is no evidence in the record that Lexington ever refused to pay a bill for defense costs *before* those costs had been reimbursed by AEGIS and EIM.

In short, Con Ed and Con Ed alone made the election to look to its other insurance to cover its defense costs in the first instance. It affirmatively prevented Lexington from controlling the defense of the Lexington Avenue steam pipe lawsuits and influencing Con Ed's litigation strategy – which, as Judge Chin noted in *Smart Style*, is the right of every insurer with a duty to defend. *Smart Style*, 930 F. Supp. at 164. While there are perfectly sound business reasons why Con Ed might not have wanted to hand over control of its own defense to Team's insurer, it cannot have its cake and eat it, too.[4] Con Ed chose to eat up coverage that could have been applied toward settlements by paying defense costs out of eroding non-primary policies; Con Ed is bound by the choice it made.

---

[4] "In accordance with the terms and conditions of the policy…each additional insured must…cooperate in the defense of any actions…. Failure to comply with this provision, may, at our option, result in the claim or "suit" being denied." (LEX0003672.)

Finally, Con Ed tries to avoid the fact that it has suffered no damages by claiming that it does not intend to keep any money that it wins in this lawsuit; rather, it plans to tender that money back to AEGIS and EIM in the hope of restoring coverage (in the case of AEGIS) or coverage limits (in the case of EIM). (Opp. At 3.) But Con Ed does not assert any claim on behalf of or in right of AEGIS and EIM in its complaint; it sues only for its own damages. It is far from clear that AEGIS or EIM has any claim they could assert against Lexington, whether directly or through their mutual insured, because the excess policies are non-contributing with the primary policy.[5] Had Con Ed already paid back the money it received from AEGIS and EIM, it might have a stronger case; but it has not done so, and there is no indication in the record that AEGIS or EIM are pressing it to do so, or for that matter have any right to do so. Lexington – which had no opportunity to control the defense for which it is now being asked to pay – has no obligation to fund gratuitous payments to Con Ed's other insurers, or to help Con Ed reinstate coverage that Plaintiff elected, of its own free will, to deplete.

For these reasons, Lexington's motion for partial summary judgment is, therefore, granted, and Con Ed's breach of contract case is dismissed to the extent of any defense costs that have already been reimbursed by AEGIS and EIM.

That disposes of the bulk of the money at issue in this lawsuit.

---

[5] This is yet another difference between this case and *Flintkote*, where the plaintiff insured was asserting claims for contribution and subrogation on behalf of other insurers, leading Judge Patel to rule that amounts attributable to those claims would have to be deducted from any "losses" that the plaintiff insured suffered. *Flintkote,* 2008 WL3270922 at *7. In this case, ConEd's complaint does not plead a claim for contribution or subrogation on behalf of AEGIS and/or EIM– it simply sues for its own purported damages. See, Complaint, Docket #1. Since, as noted at the outset of this opinion, all the policies involved in this case, whether primary or excess, were to be non-contributing with each other, it would appear that the insurers have no right to sue each other for contribution in any event. See Stanovich, "Primary & Non-Contributory," at www.irmi.com/expert/articles/2012/stanovich03-cgl-general-liability-insurance.aspx. If they cannot sue for contribution directly, then ConEd cannot obtain contribution on their behalf.

16

## III.   Lexington's Motion to Dismiss So Much of Con Ed's Claim as Reimbursement for Defense Costs Incurred Before September 14, 2007 is Granted

What we have left is the $5 million in self-insured retention and the cost of Con Ed's in-house lawyers. As to that claim, on this motion Lexington seeks essentially a declaration that it does not owe any money for defense costs incurred (1) before it was formally notified of the claim, on September 14 2007, or (2) after it paid in the policy on May 4, 2011. I will recast the motion as a motion for summary judgment dismissing so much of Con Ed's claim as it seeks to recover defense costs incurred prior to the former date or after the latter.

Con Ed does not disagree that Lexington's obligation to defend ended on May 4, 2011, when it paid in its policy at 100% of the limit of liability on the occurrence. Indeed, Con Ed has released Lexington from liability for any defense costs incurred after that date. (Kevane Decl. Exh. 18 at CONED 0000779.) However, Con Ed vigorously disagrees that Lexington is not liable for defense costs incurred prior to September 14, 2007, the date on which it gave notice and appeared to tender defense of the lawsuits to Lexington.

On this point, Con Ed, not Lexington, has the better of the argument. But unfortunately for Con Ed, that will not get it the reimbursement it seeks.

In New York, an insurer's duty to defend is triggered by the filing of a complaint containing allegations that could possibly bring the action within the scope of coverage provided by the insurance policy. *Smart Style Industries, Inc., v. Pennsylvania General Ins.* Co., 930 F. sup. 159 (S.D.N.Y. 1996), *citing Goldberger v. Lumber Mut. Cas. Ins. Co.*, 297 N.Y. 148, 154 (1948) and *Recant v. Harwood*, 222 A.D. 2d 372 (1st Dept. 1995). The insurer is, therefore, ordinarily liable for defense costs "from the time that the duty was triggered (i.e., when a complaint alleging acts arguably entitling the insured to coverage is made) . . . ." *Maryland Casualty Co. v. W.R. Grace & Co.*, 1994 WL 167962, at *5 (S.D.N.Y. 1994). This is because, in New York, "the duty to defend

17

provides broad protection to policyholders for all defense costs incurred where a complaint arguably falls within the scope of the policy. *Smart Style, supra.*, citing *Seaboard Surety Co. v. Gillette Co.*, 486 N.Y.S.2d at 876 (1984).

Recently there has developed a narrow exception to this default rule: when an insurance policy contains a so-called "voluntary payments" provision, which bars an insured from making a payment, assuming an obligation or incurring an expense in connection with the defense of a claim without the insurer's consent, the duty to defend may not be triggered by the filing of a complaint. Such clauses are enforceable, just like any other clauses in an insurance policy. However, they "cannot literally be read as prohibiting an insured from incurring *any* expense without the explicit prior approval of the insurer. Rather, the clause must be construed according to the reasonable expectations of the insured." *Smart Style, supra.*, at 163.

The Lexington Policy contains a standard "voluntary payments" clause, which provides as follows:

> No insured will, except at that insured's own cost, voluntarily make a payment, assume any obligation, or incur any expense, other than for first aid, without our consent.

(Kevane Decl., Ex. 13, at LEX 0003656, Section V.2.d.)  In its Reply Brief (page 8), Lexington – for the first time in this litigation – argued that this clause provided a complete defense to any claim Con Ed might make for reimbursement of expenses incurred prior to the date on which it gave Lexington notice.

Con Ed has an answer for this argument.[6]

---

[6] By all rights the court should have ignored Lexington's voluntary payments argument, since it was raised for the first time in a Reply Brief. *DSND Subsea AS v. Oceanografia, S.A. de C.V.*, 569 F. Supp. 2d 339, 347 (S.D.N.Y. 2008). But I did not – although I ruled on it while erroneously believing that the policy did not contain a voluntary payments clause. Once Lexington pointed out that mistake, I withdrew an earlier version of this opinion and invited ConEd to respond to the

It is undisputed that Lexington never raised the voluntary payments defense prior to the filing of its Reply Brief. It did not raise the defense in its October 6, 2008 reservation of rights letter to Con Ed – although the letter discussed numerous exclusions and other policy provisions that caused Lexington to reserve its rights. Similarly, it did not raise voluntary payment as an affirmative defense to the complaint in this action. Therefore, says Con Ed, Lexington has waived its right to assert this defense.

Under New York law, when an insurer disclaims coverage on specific grounds but not others, its silence "is deemed *conclusive* evidence of the insurer's intent to waive the unasserted grounds." *State of New York v. Amro Realty Corp.*, 936 F. 2d at 1432 (emphasis in original); *Luria Brother & Co., Inc. v. Alliance Assurance Co., Ltd.,* 780 F. 2d 1082, 1090 (2d Cir. 1986). See also, 16C Appleman & Appleman, "Insurance Law and Practice," §9260 at 393 (1981). Given Lexington's failure to raise voluntary payments at the time it reserved its rights on numerous specific grounds – October 6, 2008 – it appears to this court that Lexington has waived the voluntary payments defense.

Con Ed also argues that Lexington waived the defense by failing to assert is as an affirmative defense to the complaint and failing to mention the issue until the summary judgment stage. *Ins. Co. of North America v. Milberg Weiss Bershad Specthrie & Lerach*, 1996 WL 520902, at *7-8 (S.D.N.Y. Sept. 12, 1996); *Walton v. Breeyear*, 2007 WL 446010, at *8 (N.D.N.Y. Feb. 8,

___

voluntary payments argument – which invitation ConEd accepted. Therefore, as far as I am concerned, the issue, now fully framed, is properly before the court. Furthermore, ConEd actually introduced the term "voluntary payments" into this lawsuit in its responsive memorandum of law. It did so while distinguishing this case from *Smart Styles*, which Lexington had cited for the proposition that reimbursement of defense costs could not be had prior to the date when the insurer was given notice of the claim.

19

2007). I am far less receptive to this argument because, as Lexington points out, Con Ed pleaded its claim as a request for reimbursement of defense costs "from the time Lexington received notice until it paid its policy limits." (Complaint, ¶16.) Lexington had no reason to assert a voluntary payments defense given the way Con Ed chose to frame its pleading – and of course it is the complaint that frames the issues in a lawsuit. *Podell v. Citicorp Diners Club, Inc.*, 914 F. Supp. 1025 (S.D.N.Y. 1996).

So on the one hand, as a matter of New York law, Lexington waived the voluntary payments defense five and one half years before this lawsuit began. On the other hand, when Con Ed finally filed its complaint it specifically asserted a claim that did not include amounts that it would have been able to collect because of Lexington's waiver. The question is: Can Con Ed now take advantage of Lexington's waiver to pursue its claim for pre-notice costs?

The answer is: no. Con Ed has not pleaded a claim for these costs and it is far too late for Con Ed to amend its complaint to do so.

Fed. R. Civ. P. 15(a) governs the amendment of pleadings "before trial." It provides, in pertinent part, as follows:

> In all [] cases, a party may amend its pleading only with
> the opposing party's written consent or the court's leave.
> The court should freely give leave when justice so requires.

Fed. R. Civ. P. 15(a)(2). By asserting a claim for reimbursement of pre-notice defense costs, Con Ed is effectively amending its pleading. It has not asked this court for permission to do so, and Lexington most certainly has not consented to any such amendment.

The rule requires the court to give leave "freely . . . when justice so requires." In this contest between two behemoth corporations, both of which are represented by able and experienced counsel and each of which has made a tactical mistake (Lexington by not asserting the voluntary

20

payments defense at the earliest opportunity; Con Ed by framing its pleading as though Lexington

had not previously waived the defense), abstract considerations of "justice" seem almost beside

the point. So we turn to the rules.

The complaint's parameters are clear and unambiguous.

This court set December 22, 2014 as the last date for serving an amended pleading. Civil

Case Management Plan, Docket #15. Con Ed did not serve an amended complaint on or prior to

that date.

Thereafter, it litigated its claim as though its right to expense reimbursement arose on

September 14, 2008, and not before. For example, in its interrogatory responses, Con Ed said:

> Lexington was obligated to defend Con Edison until Lexington
> paid its policy limits in May 2011, once Lexington received notice
> of the Con Edison claim. Defense costs paid by Con Edison after
> it gave notice to Lexington that eroded the self-insured retention
> are defense costs that should have been paid by Lexington.

(Kevane Decl. Ex. 5, response to interrogatory No. 11 at page 4.) The interrogatory reinforced the

limited nature of Con Ed's claim, and Lexington made its motion for summary judgment with the

understanding that Con Ed's claim was as pleaded.[7] It was not until Con Ed responded to

Lexington's motion that it asserted an entitlement to reimbursement of pre-notice defense costs.

It is well settled in this Circuit that a court is well within its rights to refuse leave to amend

after the date set in the case management order passes. *Zahra v. Town of Southold*, 48 F.3d 674,

---

[7] Or did it? Lexington did not seek summary judgment on ConEd's claim for reimbursement of
the $5 million SIR and in-house counsel costs – defense costs that were not covered by the excess
policies. But it did ask for an order "directing that any recovery by Con Edison is limited to costs
for which it was not already reimbursed that were incurred after September 14, 2007 and before
May 5, 2011." (Moving Brief at 10) That is a most unusual request. With the benefit of hindsight
I would guess that someone at Lexington thought ConEd might try to go beyond its pleading and
recover pre-notice costs – perhaps by amending its pleading to conform to the proof at trial – and
wanted to eliminate that possibility.

21

685 (2d Cir. 1995); *John Hancock Mut. Life Ins. Co. v. Amerford Int'l Corp.*, 22 F.3d 458, 462 (2d Cir. 1994).

And, although a summary judgment motion may be construed as a motion to amend a pleading, it is analyzed using the same standard as a standalone motion to amend. *Block v. First Blood Associates*, 988 F.2d 344, 350 (2d Cir. 1993). Under that standard, it is similarly well settled that "[a] proposed amendment is especially prejudicial when discovery has been completed and a summary judgment motion has been filed." *Zubulake v. UBS Warburg LLC*, 231 F.R.D. 159, 161 (S.D.N.Y. 2005).

There is no injustice in forcing Con Ed to live within the parameters of its complaint, or to enforcing compliance with the rules just discussed. Con Ed was fully aware of the defect in Lexington's reservation of rights letter at the time it filed its complaint. It was the master of that complaint. It framed the issue as it chose, and it made no effort to expand its right to recovery until Lexington moved for partial summary judgment.

I thus decline to allow Con Ed to amend its pleading at this late date. Lexington did indeed waive its right to assert the voluntary payments defense, but Con Ed, by failing to plead a claim for pre-notice defense costs, waived its right to take advantage of Lexington's waiver.

This being so, the only thing that remains to be tried is the amount of unreimbursed defense costs Con Ed incurred from and after the date of notice, which is September 14, 2007, and ending on May 4, 2011. Whatever that amount, Con Ed's unreimbursed out-of-pocket costs incurred during that three-and-three-quarter year period are subject to Lexington's duty to defend and must be reimbursed.[8]

---

[8] Whether those out-of-pocket costs can lawfully include the cost of in-house counsel (which is, in effect, a payment from Con Ed to Con Ed) is an interesting question – one that I am sure will be briefed prior to the trial.

## Conclusion

For the foregoing reasons, Lexington's Motion for Summary Judgment is granted in part

and denied in part. This constitutes the decision and order of the court. The Clerk will remove the

motion at Docket #36 from the court's list of active motions.[9]

Dated: September 9, 2015

_Colleen McMahon_

U.S.D.J.

BY ECF TO ALL COUNSEL

---

[9] When weighing in on the "voluntary payments" issue, Con Ed attempted to expand the record by including the transcript of a deposition taken after this motion was fully briefed. Con Ed also briefed an issue not comprehended by the original motion – whether its payment of defense costs prior to notice really was "voluntary" and whether it was those costs were "reasonable." *See* Docket #63. I have ignored both the deposition and the new argument in this opinion. In any event, those issues could never have been resolved on summary judgment, as my esteemed colleague Judge Baer explicitly recognized in *Hugo Boss Fashions, Inc. v. Federal Ins. Co.,* 1999 WL 993689 at *5 (S.D.N.Y. 1999). They would have been hammered out at trial had I not concluded that the scope of Con Ed's claim was limited by its pleading.